UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JESSICA CORREA,

                    Plaintiff,

vs.

TROUTMAN SANDERS LLP and GERALD
FRANCESE, jointly and severally,

                    Defendants.

**COMPLAINT**

Electronically Filed

Civil Action No. _____

**JURY DEMANDED**

Plaintiff Jessica Correa (hereinafter "Ms. Correa" or "Plaintiff"), by and through her attorneys Eisner & Dictor PC, whose offices are located at 39 Broadway, Suite 1540 New York, New York, 10006, for her complaint alleges upon information and belief as follows:

<u>**NATURE OF THE ACTION**</u>

1.    Plaintiff brings this action against Troutman Sanders LLP (hereinafter "Defendant Troutman" or "the firm"), Gerald Francese (hereinafter "Defendant Partner Francese") (collectively referred to throughout as "Defendants,") due to their unlawful sex discrimination, sexual harassment and retaliation based on the same in violation of Title VII of the Civil Rights Act of 1964, ("Title VII") 42 U.S.C. § 2000e *et seq*.

2.    Plaintiff further brings this action based on Defendants' violation of New York State Human Rights Law ("NYSHRL"), New York Executive Law § 290 *et seq.* and New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-101 *et seq.* for unlawful sex discrimination, sexual harassment and retaliation.

3.    This lawsuit seeks actual, compensatory and punitive damages as well as declaratory and injunctive relief based on Defendants unlawful discrimination, sexual harassment and retaliation based on the same against Plaintiff.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction under 28 U.S.C. §1331, as this action arises under Title VII.

5.    This Court may assert supplemental jurisdiction over Plaintiff 's NYSHRL and NYCHRL claims under 29 U.S.C. § 1367.

6.    Venue is proper in the Southern District of New York, under 28 U.S.C. §1391, where the events and/or omissions giving rise to Plaintiff 's claims occurred in New York, New York.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.    On November 13, 2018, Plaintiff filed her initial complaint with the Equal Employment Opportunity Commission ("EEOC"). On April 22, 2019, Plaintiff timely requested her right to sue letter from the EEOC.

8.    On May 14, 2019 Plaintiff received a right to sue letter from the EEOC, dated May 8, 2019.

## PARTIES

9.    Plaintiff Jessica Correa (hereinafter "Plaintiff") is a forty-three-year-old female, who currently resides, and at all times relevant to this charge resided, in New York County, New York.

10.    Plaintiff is and was, at all times relevant herein, an "individual" and "employee" of Defendant Troutman Sanders LLP within the meaning of all relevant federal, New York State and

local laws, including, but not limited to, Title VII of the Civil Rights Act, 42 U.S.C. §§2000e *et. seq.* ("Title VII").

11.    Upon information and belief, at all times relevant to the Complaint, Defendant Troutman was and is a limited liability partnership. Upon information and belief, Defendant Troutman maintains its principal place of business at 600 Peachtree Street, NE, Suite 3000, Atlanta, Georgia 30308 and maintains its New York office at 875 3rd Ave, New York, New York, 10022.

12.    Defendant Troutman was, at all times relevant to this charge, Plaintiff's "employer" within the meaning of within the meaning of 42 U.S.C. §2000e, as it is engaged in an industry affecting interstate commerce and employed more than 20 employees for each working day during each of 20 or more calendar work weeks in the current and preceding calendar year.

13.    Upon information and belief, Defendant Partner Francese is and has been at all times relevant to this action, a Partner and a direct supervisor over Plaintiff at Defendant Troutman. Upon information and belief, and at all times relevant to the Complaint, Defendant Partner Francese had direct control over employment practices at Defendant Troutman. Defendant Partner Francese is a white man who was approximately fifty-eight years old at the time of the events giving rise to Plaintiff's claims.

14.    Upon information and belief, and at all times relevant, Defendants maintained, individually and jointly, substantial control over the terms and conditions of Plaintiff's employment, including but not limited to, hiring and firing authority, disciplinary authority and authority to investigate sex discrimination, sexual harassment and hostile work environment claims.

## OPERATIVE FACTS

### Plaintiff is a female and thus is a member of a protected class.

15.     Plaintiff is a female, highly skilled personal assistant with twenty years of experience working as a legal secretary in large, New York City law firms.

### Plaintiff is hired as a legal secretary at Defendant Troutman.

16.     In or around January 2018, Plaintiff was offered the position of legal secretary at Defendant Troutman.

17.     Plaintiff was immediately assigned to work for two male Partners-Defendant Partner Francese, and Patrick Costello.  Her duties included answering their phones, handling their calendars, managing their expenses, and otherwise assisting them.

### Defendant Partner Francese invites Plaintiff to lunch and establishes himself as her "friend."

18.     After Plaintiff was hired, but before her official start date of January 17, 2017, Defendant Partner Francese invited her out to lunch. Defendant Partner Francese told her he was her "friend."  Plaintiff was thrilled that her new boss seemed to be very kind and that he envisioned a team approach to their work.

19.     Defendant Partner Francese explained to Plaintiff that he would be out of state for her first month of work with his family, but that he looked  forward to working with her when he returned.

### Plaintiff begins working at Defendant Troutman without issue.

20.     On or about January 17, 2017, Plaintiff started working at Defendant Troutman as a legal secretary for Defendant Partner Francese and Partner Patrick Costello (hereinafter "Partner Costello").

4

21.     Plaintiff was thrilled to finally achieve her goal of working at Defendant Troutman and initially, she experienced no issues with any of her superiors or colleagues.

22.     Plaintiff's colleagues advised her that Defendant Partner Francese usually takes his staff out to lunch, that "he's very generous" and "a godfather-like figure." Plaintiff also learned that Defendant Partner Francese was well-liked around the office in general, and he shared candy with staff and colleagues and celebrated special occasions with top-shelf alcohol.

23.     Throughout her employment Defendant Partner Francese would frequently talk about his lavish purchases, such as his watch. For example, in or about March of 2017, he specifically advised Plaintiff that his wristwatch was worth $25,000 and that "the band alone is $2,500.00."

24.     Upon information and belief, Defendant Partner Francese made comments like these in an attempt to impress Plaintiff.

**When Defendant Partner Francese returns from vacation he bizarrely begins subjecting Plaintiff to demeaning nicknames and sexually harassing conduct.**

25.     Defendant Partner Francese returned to work in or about mid-February of 2017. To Plaintiff's shock, he immediately began calling her "Cutie," and stated, "Hey cutie, I know I shouldn't say that, is it ok I call you 'cutie'?"

26.     Defendant Partner Francese invited Plaintiff into his office, told her to sit and began openly and purposefully staring at her breasts  while he asked her how her day had been. Thereafter, Defendant Partner Francese made a habit of staring directly at Plaintiff's breasts each time they interacted.

27.     Plaintiff chose to ignore his harassing comments and conduct. She was determined to not let Defendant Partner Francese's disturbing and demeaning behavior affect her opportunity to work for Defendant Troutman.

28.     Defendant Partner Francese soon increased the hostility by making daily harassing comments designed to and having the effect of making Plaintiff feel uncomfortable, vulnerable, and sexualized.

### Defendant Partner Francese gropes Plaintiff.

29.     Early on in her employment at Troutman Sanders, Defendant Partner Francese scheduled Plaintiff to have one-on-one weekly expense meetings on Tuesdays (hereinafter the "Tuesday Expense Meeting") where he would initiate demeaning conversations.

30.     For example, Defendant Partner Francese would ask Plaintiff, "Wow, did you wear that for me?"

31.     Throughout her employment with Troutman, Defendant Partner Francese would direct Plaintiff to come behind his desk and stand uncomfortably close to him so that she could "help" him with a word processing issue on his computer.  Then, upon information and belief, so that she would know that he was staring at her body, Defendant Partner Francese would say such things as, "I can fix the button [on the back of your blouse] for you if you want."

32.     Plaintiff was horrified but needed her job to support herself and her child, so she tried to talk herself into ignoring the outrageous sexual harassment and hoped that it would not worsen. Plaintiff tried to avoid  being alone with Defendant Partner Francese and simply ignored his comments.

### Defendant Partner Francese begins persistently harassing Plaintiff by inviting her to dinner.

33.     During February of 2017, Defendant Partner Francese began repeatedly and persistently asking Plaintiff to go to dinner with him.

34.     When Plaintiff ignored his requests, Defendant Partner Francese attempted to incentivize Plaintiff by telling her that she could pick any restaurant, no matter the cost. Francese told Plaintiff all she needed to do was add it to his calendar.

35.     After several failed attempts to pressure Plaintiff into going to dinner with him, Defendant Partner Francese reframed his request by insisting Plaintiff attend a "work dinner" with him.

36.     Realizing that she had no choice, Plaintiff agreed to attend the "work dinner" on March 29, 2017 at Gaonnuri, an upscale Korean restaurant known for its table barbeque service on the 39th floor of a skyscraper in Manhattan.  Defendant Partner Francese gleefully advised her that the dinner would take place at Gaonnuri, an upscale Korean restaurant known for its table barbeque service on the 39th floor of a skyscraper in Manhattan on March 29, 2017.  Plaintiff feared that Defendant Partner Francese felt that he was taking Plaintiff on a "date," and she became extremely anxious ab0out being alone with him outside of the office.

**Defendant Partner Francese pats Plaintiff's upper thigh.**

37.     On the morning of March 29, 2017, Defendant Partner Francese again called Plaintiff into his office, and made her come stand behind his desk, allegedly to view his computer monitor. As she turned to walk away, Defendant Partner Francese patted her upper left thigh, just below her buttocks. Plaintiff was so stunned, humiliated, and embarrassed that she simply stumbled out of the office.

38.     Defendant Partner Francese called after her that he was "looking forward to [their] dinner."

**Plaintiff objects to the sexual harassment.**

39.     Plaintiff spent the day fearing the so called "work dinner" and rehearsing what she would say to Defendant Partner Francese so that he would understand that he could not harass her.

40.     That night, as they waited for their table, Plaintiff stated, "I didn't feel comfortable with you touching me today."

41.     Appearing shocked, Defendant Partner Francese feigned ignorance and responded, "what do you mean?" Plaintiff said, "I'm not that type of woman." Defendant Partner Francese failed to respond or apologize, he simply shook his head and then changed the subject.  Still, Plaintiff hoped that he got the message that she would not acquiesce to his sexual harassment.

**Defendant Partner Francese attempts to kiss Plaintiff and speaks vulgarly.**

42.     At dinner, Defendant Partner Francese secured a table with a view of the city skyline and demanded that Plaintiff "pull her chair closer" to him. Defendant partner Francese proceeded to tell Plaintiff that he and another Troutman attorney had hired "Korean prostitutes" to perform oral sex on them in the backseat of a car. The story made Plaintiff feel horrified, embarrassed and scared.

43.     At the end of the dinner, Defendant Partner Francese insisted on calling Plaintiff a car to take her home. When the car arrived and she was about to depart, he made it clear that he expected a hug from her, which she awkwardly submitted to. As she was about to get into the car Defendant Francese gruffly ordered, "Let me get a kiss," and moved toward Plaintiff in an attempt to kiss her. Plaintiff pushed him away and got into  the car. Plaintiff was extremely scared and upset and she began shaking and experiencing severe anxiety. Plaintiff felt nauseous and feared that she would throw up.

**Plaintiff ignores Defendant Partner Francese.**

44.     After the dinner, Plaintiff deliberately and clearly ignored Defendant Partner Francese in an effort to have him stop his sexual advances.

45.     Thereafter, Plaintiff was relieved to see that Defendant Partner Francese had apparently gotten the message and seemed to "back off" in the weeks following their dinner.

**Defendant Partner Francese tells Plaintiff that she "Needs a Sugar Daddy."**

46.     In the Spring of  2017, Plaintiff experienced significant tragedies in her life, including having to financially assist her mother who was suffering from serious illnesses. At a May 2017 weekly meeting, Plaintiff revealed to Defendant Partner Francese that she was dealing with some personal issues so that he would be aware that she may need some time off. Defendant Partner Francese listened and told her "to let [him] know how [he] could help." Defendant Partner Francese offered specifically to provide time off from work, financial help, and to excuse any late arrivals, but strangely, he told her that he would only help if Plaintiff expressly "asked [him] for help."

47.     Plaintiff was hopeful that her employment relationship with Defendant Partner Francese had turned a corner, and that he would no longer sexually harass her and that they could become colleagues.

48.     Throughout May of 2017, Defendant Partner Francese seemed to adopt a paternal role towards Plaintiff and regularly invited her into his office to kindly chat and would offer her candy that he kept on his desk. Defendant Partner Francese asked Plaintiff to continue to update him about her family hardship and financial difficulties. Defendant Partner Francese attempted to hold himself out as a supportive and paternal figure by asking Plaintiff how she was dealing with the various difficulties she was facing.

49.     At this time, as a result of recent family deaths, Plaintiff's financial situation had become more serious and difficult. As a single mother, Plaintiff felt she had no one else to turn to except Defendant Partner Francese, and she ultimately asked Defendant Partner Francese for assistance. Defendant Partner Francese gave her a loan of $500 via wire transfer and then a check in the amount of $2,100.00.

50.     At the next weekly meeting in May of 2017, Plaintiff continued to update Defendant Partner Francese as to the state of her personal issues. In response, Defendant Partner Francese winked at Plaintiff and said, "You know what you need? You need a Sugar Daddy."

51.     Plaintiff understood that Defendant Partner Francese was referring to the idea that Defendant Partner Francese would be willing to pay her money in exchange for sexual acts, and Plaintiff could use that money to help her family situation

52.     Upon information and belief, Defendant Partner Francese used Plaintiff's vulnerable and indebted state, to escalate his coercive sexual advances.

**Following the proposal to be her "Sugar Daddy," Defendant Partner Francese continues to incessantly make lavish offers in exchange for a sexual relationship.**

53.     Thereafter, Defendant Partner Frances once again began making constant comments about Plaintiff's appearance and it was clear that he was no longer "behaving."

54.     On or about June 15, 2017, Defendant Partner Francese began asking Plaintiff when they were going to have dinner together again. He would frequently say, "pick day and put it in my calendar." Plaintiff avoided answering Defendant Partner Francese and responded by saying, "No, thank you," fearing that "dinner" now would again come with sexual demands attached.

55.     When Plaintiff refused dinner, Defendant Partner Francese attempted to portray himself in a generous and paternal light. He told Plaintiff, "I'm here for you" and encouraged her to share more personal information with him in an effort to groom her.

56.     In late June of 2017, Defendant Partner Francese planned a luxury vacation for himself, his wife, his kids and grandchildren in Mexico. At the same time, Defendant Partner Francese, knowing of Plaintiff's personal and financial issues, directed Plaintiff to come behind his desk and asked, "Where would you go if you were to go on vacation?" Defendant Partner Francese invited Plaintiff to look at all the all-inclusive vacation packages he was reviewing on his computer monitor and to "pick one."

57.     As she could never afford anything like the trips he was reviewing, Plaintiff was incredibly uncomfortable and tried to laugh it off. Defendant Partner Francese's tone became serious and he reiterated to Plaintiff: "Pick a place, wherever you want to go…all you have to do is let me know."

58.     Plaintiff understood that Defendant Partner Francese's offer to pay for a luxury vacation was an attempt to be her "Sugar Daddy" as he had previously suggested.  Plaintiff became even more anxious and humiliated. She wondered when the next sexual demand going to happen, and why this was happening only to her. At the same time, Plaintiff had already begun to normalize Defendant Partner Francese's behavior so that she could put on a cheerful mask and focus on her work.

59.     Plaintiff refused to accept his vacation offer and walked out of his office.

**Despite Defendant Partner Francese's demeaning and distracting demands, Plaintiff excels at her job.**

60.     Following the encounter where Defendant Partner Francese attempted to ply Plaintiff with promises of a vacation, she continued to excel at her job as a legal secretary and ultimately was invited to take on a heavier workload and wider range of work.

61.     Although Plaintiff was only working for Defendant Partner Francese's practice group within the firm when she began working at Troutman, she quickly became known for being

exceptionally hard working and efficient. By March of 2017, she was asked to start assisting in the Construction Practice Group, as well other Partners in the Corporate group.

62.     Plaintiff greatly enjoyed working with the Construction practice group and other attorneys within the Corporate Practice Group where she was well respected by the partners and associates and did not experience sexual harassment.

### Defendant Partner Francese forcibly kisses Plaintiff after a Client's non-profit Fundraising Event.

63.     On October 25, 2017, Defendant Partner Francese insisted Plaintiff attend a nonprofit Fundraising Event with him. At the event Defendant Partner Francese introduced Plaintiff to many of his associates and acquaintances. When he introduced Plaintiff, Francese would refer to her as "my personal assistant."

64.     At the end of the event, Defendant Partner Francese insisted that Plaintiff share a taxi with him since they were both headed uptown. When they reached Plaintiff's stop, Defendant Partner Francese hugged her, then surprised her by kissing her, unexpectedly. Plaintiff was outraged and humiliated made her feelings clear to Defendant Partner Francese. Humiliated by Defendant Partner Francese's nonconsensual kiss, Plaintiff immediately exited the taxi.

### Following her rejection of him, to Defendant Partner Francese retaliating against Plaintiff.

65.     Following her refusal to engage with him sexually, Defendant Partner Francese made it clear that he and Plaintiff's job was in jeopardy.  From on or about November of 2017 through February 2018, Defendant Partner Francese repeatedly warned Plaintiff that the firm's Human Resources personnel were watching her closely, including her attendance, performance, arrivals, departures and lunches. He told her that the Human Resources Manager Patrizia DeGennaro (hereinafter "HR Manager DeGennaro") was instructing her fellow legal secretaries,

including but not limited to Amy Reynoso (hereinafter "Legal Secretary Reynoso"), to monitor Plaintiff.

66.     Further, Defendant Partner Francese began regularly reminding Plaintiff that he "wanted to see [her] be successful in the firm" and that he *alone* was her ally, her protector and the only person trying to "save [her] because [her] job [was] on the line."

67.     Upon information and belief, Defendant Partner Francese made these coercive statements in order to isolate Plaintiff from possible sexual harassment reporting resources, including her peers and the firm's the Human Resources department.

**Defendant Partner Francese asks Plaintiff s to be his "companion."**

68.     On or about early December 2017, having isolated Plaintiff within the firm, Defendant Partner Francese instructed Plaintiff to attend a holiday dinner with him at Wolfgang Steakhouse.

69.     Plaintiff found that she was increasingly anxious at work and especially panic-stricken before their weekly Tuesday Expense Meetings. Believing that the only way she would keep her job at Troutman was to remain in Defendant Partner Francese's good graces, Plaintiff did not feel she had a choice, but committed to herself that she would use the dinner to establish verbal and physical boundaries and insist that Francese maintain a strictly professional relationship with her.

70.     At Wolfgang Steak House, Defendant Partner Francese chose a dimly lit table in a back corner of the restaurant. Defendant Partner Francese immediately told Plaintiff that "[he] liked [her]" and that he "[was] looking for a friend of some sort to keep [him] company." Defendant Partner Francese explained that the type of friend he was looking for was someone with whom he could spend time with during the week and attend Broadway shows, have dinners, and

go to clubs. He further explained he had two women that had previously been his friends, and that he had "helped" those women. Defendant Partner Francese continued that that he could help Plaintiff in a similar way. Plaintiff understood that Defendant Partner Francese was looking for a romantic or sexual relationship with her in exchange for his offers of financial assistance.

71.     In response, Plaintiff firmly and unambiguously told Francese "I cannot accept your offer." Plaintiff explained that "[she] enjoy[ed] working for Troutman" and "[she was] happy working for the attorneys [she was] assigned to." Plaintiff further explained that "[she is] not that kind of woman."

72.     Defendant Partner Francese in turn asked if she wanted him "to stop" to which Plaintiff replied, "yes." Plaintiff then reminded him that he was married and that it was wrong of him to make such propositions and advances.

73.     Defendant Partner Francese did not respond; instead he stroked his hand against her right cheek, further causing Plaintiff extreme discomfort and humiliation.

**Defendant Partner Francese continues to torment Plaintiff by reminding her that Human Resources is "watching her."**

74.     Following the dinner where Plaintiff refused Defendant Partner Francese's quid pro quo offer and objected to Defendant Partner Francese's conduct and asked him to stop, he continued to coerce, manipulate and harass Plaintiff by telling her that he was her only ally and that he alone protected her job. He also repeatedly reminded Plaintiff that the firm's Human Resources personnel were watching her closely.

75.     As a direct result of these repeated threats, Plaintiff continued to feel isolated, paranoid and nervous in the office and worried that she was being retaliated against for telling Defendant Partner Francese to stop harassing her.

**<u>Defendant Partner Francese tries again and retaliates more.</u>**

76.      At a Tuesday Expense Meeting following the dinner at Wolfgang Steak House, Defendant Partner Francese asked Plaintiff whether she really wanted him to "stop." Plaintiff understood that he was referring to the conversation they had during dinner.  Knowing she could not have been clearer in each of the previous instances where she asked Defendant Partner Francese to stop harassing and vulgar behavior toward her, the question caused her to feel anxious and embarrassed. Nevertheless, Plaintiff was able to muster the courage to firmly and emphatically say "yes" and then asked him what she had done "to attract this behavior?" She told Defendant Partner Francese that she could recall working for difficult attorneys in her twenty-year career, noting that one had been particularly difficult, but that she had never been subjected to the language and behavior that Defendant Partner Francese directed at her on a daily basis.

77.      Defendant Partner Francese responded, "Did he ask you to suck his dick?" Francese was referring to the attorney that Plaintiff had worked for previously and noted was particularly difficult.

78.      Plaintiff was shocked and humiliated by Francese's comment.

79.      Defendant Partner Francese then outrageously asked Plaintiff twice, "do you shave your pubic hair?" Near speechless, Plaintiff responded by asking, "Are you serious? Are you finished?" and then left his office.

80.      Later that evening, Plaintiff sent Defendant Partner Francese a text that read, "[h]ow would you like it if someone said that to you daughters? If their boss asked them to suck his dick?"

81.      Defendant Partner Francese replied with "???"

82.    Plaintiff realized that by responding with three questions marks, Defendant Partner Francese was framing the text message conversation to appear as if he had no understanding of the reference to his harassing and vulgar comment.

83.    The very next morning after receiving his text message, Plaintiff immediately began to feel extremely worried for her job, her career and her future, and felt overwhelmingly scared for sending the initial text message.

84.    After a sleepless night, Plaintiff went directly to Defendant Partner Francese's office to ask for forgiveness feeling she had done something wrong. When Plaintiff apologized, Defendant Partner Francese reprimanded her, and threatened her by saying, "You know what you did was dangerous, very dangerous" and, "You put it in writing." Plaintiff understood that Defendant Partner Francese knew a text message was potential evidence of his harassing and unlawful behavior that could expose him to consequences such as losing his job or worse.

85.    Immediately, Plaintiff felt intimidated and threatened and deleted her text message following her meeting with Defendant Partner Francese. Defendant Partner Francese placed Plaintiff under extreme stress by blaming her for his "dangerous" and sexually harassing comment. Plaintiff felt that she had done something horribly wrong and, since the situation, Defendant Partner Francese created an uncomfortable situation where Plaintiff was afraid and felt threatened that she might lose her job.

**Following her "dangerous text message" and rejection of Defendant Partner Francese's advances, Defendant Partner Francese abruptly begins to retaliate against Plaintiff.**

86.    Following her written objection to his comment, Defendant Partner Francese began subjecting Plaintiff to increased scrutiny and started micro-managing her work.

87.    Plaintiff frustratingly noticed that her assignments were suddenly not "up to par."

88.     Further, Defendant Partner Francese began overly scrutinizing her work and making demeaning and embarrassing comments, including, "I need a secretary."

89.     Simultaneously, Defendant Partner Francese continued to remind her that he was the only one who could "save" her.

**At her annual performance review, Plaintiff is denied a raise based**
**on "anonymous" complaints.**

90.     On or about April 10, 2018, Plaintiff met with the Human Resources Department for her annual review.

91.     HR Manager DeGennaro explained to Plaintiff that there were "previously undisclosed complaints" about her work performance from "anonymous sources" and as a result Plaintiff was not going to receive a raise in salary for the upcoming year. Plaintiff felt humiliated and utterly despondent. She realized that the anonymous source could only have been Defendant Partner Francese. She further realized that all of his "warnings" about Human Resources were being actualized because she rejected his offers to "save" her.

92.     Upon information and belief, Defendant Partner Francese's offers to "save" Plaintiff were offers to ensnare Plaintiff in a situation where she would be obligated to provide him with sexual favors.

**Defendant Partner Francese kisses Plaintiff on the lips during a lunch he invited her to**
**and buys Plaintiff a plant.**

93.     On or about April 25, 2018, Defendant Partner Francese took Plaintiff to a lunch he had planned. In his Microsoft Outlook calendar, he titled the event "Plant shopping." Plaintiff and Defendant Partner Francese arrived at the restaurant, and Defendant Partner Francese requested a table in the back.

94.     Shortly after sitting down, Defendant Partner Francese got up from his chair, stepped to Plaintiff's side of the table, and kissed Plaintiff on her lips.

95.     Plaintiff did not expect, consent, or welcome the kiss. Plaintiff was disgusted and felt nauseous, intimidated, shocked, and extremely distressed.

96.     After the kiss, the waitress came to the table to take Plaintiff and Defendant Partner Francese's order. After giving their orders to the waitress and receiving their meals, Plaintiff excused herself, went to the bathroom where she became physically ill and vomited.

97.     When Plaintiff returned from the bathroom, the food was on the table. Plaintiff told Defendant Partner Francese that she did not feel well and would take her food to go.

98.     Defendant Partner Francese refused to leave and instead slowly ate his food and did not allow Plaintiff to leave. He told Plaintiff she could order a drink if she wanted. Plaintiff did not order a drink. During the lunch, Defendant Partner Francese talked to Plaintiff about her annual review and his expectations for Plaintiff as his secretary.

99.     After Defendant Partner Francese finished eating his food, he and Plaintiff left the restaurant and he insisted that they stop at a flower shop down the block, even though Plaintiff had repeatedly stated that she was ill. At the flower shop, Defendant Partner Francese bought himself an orchid and bought another one for Plaintiff.

**Plaintiff confides in an associate and tells him about Defendant Partner Francese unwanted comments, advances and touching.**

100.    On or about April 26, 2018, Plaintiff confided in Defendant Troutman Associate Adam Dennett (hereinafter "Associate Dennett").

101.    Associate Dennett immediately confirmed that he had witnessed Defendant Partner Francese making inappropriate comments and that Defendant Partner Francese was known throughout the firm for the same type of conduct Plaintiff had experienced. Dennett further

mentioned other associates by name that had also witnessed Defendant Partner Francese making harassing comments.

102.   Associate Dennett thereafter encouraged Plaintiff to immediately report the ongoing harassment to Human Resources, and further stated that if she did not, he would have to report the harassment himself.

### Plaintiff Reports the harassment to Human Resources.

103.   Facing an ultimatum, Plaintiff agreed to report. She waited until Defendant Partner Francese was out of office to report to Human Resources the ongoing, severe and unflagging sexual harassment she suffered under Defendant Partner Francese.

104.   After explaining that she was subjected to grossly inappropriate touching, propositioning, abusive and vulgar comments, and that Defendant Partner Francese alienated her from possible reporting mechanisms available through her peers and Human Resources by inducing paranoia, Plaintiff was advised to not come into the office on the following Monday while Human Resources investigated her complaint.

105.   After the initial investigation, the firm flew in Shawna Beldick, the firm's Human Resources Director (hereinafter "HR Director Beldick").

106.   HR Director Beldick insisted that Plaintiff meet her in a public place over breakfast to discuss the serious allegations of sexual harassment by Defendant Partner Francese.

107.   Plaintiff, scared and experiencing ever worsening anxiety about the situation, recounting her abusive work relationship with Defendant Partner Francese, was unable to attend the meeting.

108.   At that time, Plaintiff decided to seek much needed psychological care and treatment.

**Plaintiff suffers constructive discharge.**

109.    After months of psychological treatment, Plaintiff continued to suffer serious psychological stress as a result of Francese's conduct. Plaintiff was reasonably unable to return to work at Troutman knowing that Defendant Partner Francese was still working there.

110.    On or about August 20, 2018 Plaintiff was constructively discharged from her employment with Troutman.

111.    Throughout her employment with Defendants, Plaintiff was subjected to quid pro quo and hostile working environment sexual harassment. When she objected to that harassment, Plaintiff was retaliated against and ultimately discharged in violation of law.

## FIRST CAUSE OF ACTION
*Sexual Harassment and Hostile Work Environment under Title VII*

112.    Plaintiff repeats and re-alleges the each and every preceding allegation.

113.    Plaintiff is a female at all relevant times and is a member of a protected class under 42 U.S.C. §§2000e *et. seq.*

114.    Plaintiff was and is qualified to work as an employee for Defendant Troutman and is able to perform all of the duties required by the position held at Defendant Troutman.

115.    Defendants subjected Plaintiff to a hostile work environment as well as adverse employment actions because of her gender.

116.    Plaintiff was unlawfully subjected to sexual harassment when Defendants knowingly allowed Plaintiff to endure unceasing sexual comments, demands and unwelcome touching and grabbing by Defendant Partner Francese during her employment. Defendants further subjected Plaintiff to sexual harassment by doing nothing and threatening retaliation against her when she reported and objected to the sexual harassment.

117.    The sexual harassment Plaintiff suffered at Defendant Troutman was severe and pervasive, unwelcome by Plaintiff and would be offensive to a reasonable person.

118.    The sexual harassment Plaintiff suffered at Defendant Troutman severely affected the terms and conditions of her employment.

119.    Plaintiff repeatedly objected to the sexual harassment and retaliation by her Supervisor and reported the harassment to her co-worker and to Defendant's human resources. The sexual harassment Plaintiff suffered was repeatedly conducted by Defendant Partner Francese and was witnessed by Defendant's employees. Defendant knew or should have known about the sexual harassment and discrimination and its effects on Plaintiff's terms and conditions of her employment. Despite this, Defendants failed to take necessary steps to remedy the sexual harassment and hostile working environment based on the same which ultimately and proximately caused Plaintiff to suffer severe anxiety and stress.

120.    Defendants' violations of Plaintiff's rights have resulted in Plaintiff's termination, as well as loss of monetary and other benefits associated with her employment.

121.    Defendants' violations of Plaintiff's rights have also resulted in Plaintiff's extreme stress, anxiety regarding her ability to provide for herself and her family, ongoing humiliation among her family, friends and co-workers, damage to her good reputation, and disruption of her personal life.

## SECOND CAUSE OF ACTION
### *Sexual Harassment under NYSHRL and NYCHRL*

122.    Plaintiff repeats and re-alleges the each and every preceding allegation.

123.    Plaintiff is a female and thus is a member of a protected class under New York State and New York City Human Rights Laws.

124.    Plaintiff was unlawfully subjected to sexual harassment when Defendants'
Defendant Partner Francese made unceasing sexual and explicit comments and demands.
Defendants further subjected Plaintiff to sexual harassment by retaliating against her when she
reported the sexual harassment by terminating her.

125.    The sexual harassment Plaintiff suffered at Defendants was severe and pervasive,
unwelcome by Plaintiff and would be offensive to a reasonable person.

126.    The sexual harassment Plaintiff suffered at Defendants severely affected the terms
and conditions of her employment.

127.    Plaintiff repeatedly objected to the harassment by her Supervisor, Defendant
Partner Francese and Plaintiff reported the harassment to Defendants human resources personnel.
Defendants knew or should have known about the harassment and discrimination and its effects
on Plaintiff's employment. Despite this, Defendants failed to take necessary steps to remedy the
discrimination.

128.    Defendants' violations of Plaintiff's rights have resulted in Plaintiff's loss of
monetary and other benefits associated with her employment.

129.    Defendants' violations of Plaintiff's rights have also resulted in Plaintiff's extreme
stress, anxiety regarding her ability to provide for herself, ongoing humiliation among her family,
friends and co-workers, damage to her good reputation, and disruption of her personal life.

### THIRD CAUSE OF ACTION
*Retaliation under Title VII*

130.    Plaintiff repeats and re-alleges the each and every preceding allegation.

131.    Plaintiff is a female and thus is a member of a protected class under Title VII.

132.    Plaintiff was unlawfully subjected to retaliation when she objected to and
complained about unlawful supervisorial sexual harassment to her co-workers, her immediate

Supervisor, as well as Defendants. Following her objections and complaints of supervisorial sexual harassment, Defendants subjected Plaintiff to retaliation by punishing her, including but not limited to termination.

133.  Defendants' overt retaliation against Plaintiff ultimately resulted in Plaintiff's wrongful termination.

134.  Defendants' violations of Plaintiff's rights resulted in Plaintiff's loss of monetary and other benefits associated with her employment. Defendants' violations of Plaintiff's rights have also resulted in Plaintiff's extreme stress and fear, anxiety about her future and ability to provide for herself, ongoing humiliation among her family, friends and co-workers, damage to her good reputation, and disruption of her personal life.

## FOURTH CAUSE OF ACTION
*Retaliation under NYSHRL and NYCHRL*

135.  Plaintiff repeats and re-alleges the each and every allegation contained in.

136.  Plaintiff is a female and thus is a member of a protected class under NYSHRL and NYCHRL.

137.  Plaintiff was unlawfully subjected to retaliation when she objected to and complained about unlawful supervisorial and co-worker sexual harassment to her co-workers, harassers, her immediate manager, her immediate Supervisor, as well as Defendants. Following her multiple complaints of supervisorial harassment, Defendants subjected Plaintiff to retaliation by terminating her.

138.  Defendants' overt retaliation against Plaintiff and fellow female co-workers ultimately resulted in Plaintiff's termination.

139.  Defendants' violations of Plaintiff's rights resulted in Plaintiff's loss of monetary and other benefits associated with her employment. Defendants' violations of Plaintiff's rights

have also resulted in Plaintiff's extreme stress and fear, anxiety about her future and ability to provide for herself, ongoing humiliation among her family, friends and co-workers, damage to her good reputation, and disruption of her personal life.

## RELIEF SOUGHT

Plaintiff seeks judgment against Defendants as follows:

    i.   On the first case of action, awarding Plaintiff compensatory, including punitive damages in an amount to be determined at trial, but no less than $1,000,000.00.

    ii.   On the second case of action, awarding Plaintiff compensatory, including punitive damages in an amount to be determined at trial, but no less than $1,000,000.00.

    iii.   On the third case of action, awarding Plaintiff compensatory, including punitive damages in an amount to be determined at trial, but no less than $1,000,000.00.

    iv.   On the fourth case of action, awarding Plaintiff compensatory, including punitive damages in an amount to be determined at trial, but no less than $1,000,000.00.

    v.   In addition, awarding Plaintiff the costs of this action, together with reasonable attorney's fees, and, such additional equitable and legal relief as the Court deems just and proper.

## JURY TRIAL

Plaintiff demands a jury trial for all causes of action and claims for which they have a right to a jury trial.

Dated: New York, New York
       August 12, 2019

                                   Respectfully submitted,

                                   EISNER & DICTOR, P.C.
                                   *Attorneys for Plaintiffs*

                              By: __/s/ *Benjamin N. Dictor*__
                                   Benjamin N. Dictor
                                   39 Broadway, Suite 1540
                                   New York, NY 10006
                                   Tel: (212) 473-8700
                                   Fax: (212) 473-8705
                                   ben@eisnerdictor.com